Floyd Gilbert Bickel, II, and Mary M. Bickel v. Commissioner.
Bickel v. Commissioner
Docket No. 2731-65.
United States Tax Court
T.C. Memo 1966-202; 1966 Tax Ct. Memo LEXIS 82; 25 T.C.M. (CCH) 1037; T.C.M. (RIA) 66202; September 19, 1966
Oliver W. Schneider, 7701 Forsyth Blvd., Clayton, Mo., and Donald H. Whaley, for the petitioners. Leonard A. Hammes, Jr., for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax for the calendar years 1961 and 1962 in the amount of $2,962.81 and $197.85, respectively. Some of the issues raised by the pleadings have been disposed of by the parties, leaving for our decision the following: (1) Whether all or any portion of the amount expended by petitioners in 1961 for a world tour for themselves and their children is deductible as an ordinary and necessary business expense. *83 (2) Whether petitioners are entitled to deduct as ordinary and necessary business expenses in 1961 and 1962 automobile expenses in excess of the amount allowed by respondent. (3) Whether an amount of $200 received by petitioner Mary M. Bickel for cost and maintenance of uniforms is includable in her income and if so whether this same amount or any portion thereof is deductible by her as an ordinary and necessary business expense. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife who resided during the calendar years 1961 and 1962 in Ladue, Missouri, filed joint Federal income tax returns for each of those years with the district director of internal revenue at St. Louis, Missouri. Floyd Gilbert Bickel II (hereinafter referred to as petitioner) is a dentist. He has been engaged in the practice of dentistry in St. Louis, Missouri for approximately 30 years. Petitioner during the years 1961 and 1962 and for sometime prior thereto, operated a dental clinic of which he was the director. The clinic employed two or three full-time dentists in addition to petitioner and five dental assistants. One of the dental assistants *84 employed by the clinic during the year 1961 was petitioner's daughter, Wanda. Mary M. Bickel (hereinafter referred to as Mary) was employed by her husband's dental clinic during the years here involved as office manager. Petitioner's clinic maintained office hours from 9:00 a.m. to 10:00 p.m. on Monday through Friday and from 9:00 a.m. to 6:00 p.m. on Saturday. The clinic was engaged in the practice of dentistry in all forms, but its special emphasis was on pain control. Approximately one-half of the patients who come to petitioner's dental clinic are on referrals from other dentists. Most dental offices do not do operative dentistry as distinguished from dental surgery using a general anesthesia as did petitioner's dental clinic. Also, petitioner's dental clinic used other methods of pain control including hypnosis which is not generally used by dental offices for operative dentistry. In order to keep other dentists aware of his work in connection with pain control so as to obtain referrals from them, petitioner, prior to the years here involved, as well as in these years, gave lectures on pain control in dentistry. He has published articles dealing with pain control in dentistry *85 and has belonged to a number of professional dental organizations. He organized the Missouri State Dental Society of Anesthesiology and has been its president. During the years he has been engaged in the practice of dentistry he has regularly attended local, State, and national meetings of various organizations of dentists. He has also taken a number of post graduate courses during the years he has been in practice in order to improve his skills as a dentist. It has been petitioner's general custom, in giving lectures, to use photographic slides in his presentation. Sometime in 1959 or 1960 petitioner and his wife began discussing and planning for a world tour for themselves and their two children. By November 10, 1960, the plans for this trip had progressed to the point that petitioner issued a check in the amount of $1,500 to the Foster Travel Agency (hereinafter referred to as Foster) through whom the plans were being made. The trip as arranged by Foster for petitioners and their two children was for the period June 3, 1961, through September 2, 1961. Petitioners' daughter was 22 years old in 1961, and their son was 16 or 17 years of age. The trip which was arranged for petitioners *86 by Foster consisted of two parts. The first part of the trip which covered the period June 3, 1961, through August 7, 1961, was a regular package tour, known as the Bali-Hi World Tour. This tour is conducted by SITA World Travel, Inc. (hereinafter referred to as SITA), which company is represented in St. Louis by Foster. The Bali-Hi World Tour is open to the general public. This tour was advertised in 1961 for departures from Honolulu on 26 different dates, at least one departure being scheduled in each month of the year and two or more in all of the months except May, November, and December. The tour includes transportation, lodging, sight-seeing tours with guides, and some meals. Prior to August 10, 1960, Foster sent the literature with respect to the Bali-Hi World Tour to petitioner and under date of August 10, 1960, that agency submitted to petitioner a suggested private tour through Europe for him and his family. On October 3, 1960, Foster wrote to SITA for precise information as to specific dates when the Bali-Hi World Tour which was scheduled to depart on June 3, 1961, would be in the various cities covered by the tour. Petitioner had requested Foster to obtain information *87 as to when the tour would be in Djakarta and Bali, stating that he might want to schedule meetings in those cities. On January 23, 1961, Foster inquired from SITA as to the dates when the tour would be in Tokyo, Bangkok, and Bali, stating that they must know the dates soon "so as to start scheduling meetings." On February 16, 1961, Foster wrote SITA for the dates the tour would be in Manila, Djakarta, and Bali, stating "Must schedule meeting so need precise information." Petitioner paid a total amount to Foster, including the $1,500 payment on November 10, 1960, of $17,895.87, the last payment being made on May 25, 1961. This payment included the cost of the Bali-Hi tour for petitioner and his family and the costs of hotels and transportation for the European part of the trip. It also included some of the meals on the European part of the trip. Sometime in late 1960 petitioner discussed with representatives of the Ecumenical Council, the possibility of giving lectures to groups of dentists in various countries through which he would travel on the Bali-Hi tour. Petitioner was willing to make such speeches if arrangements could be made for the speeches to be given at the time he *88 would be in a particular city under the schedule dates of the Bali-Hi tour. Petitioner had some correspondence with a dentist connected with the Christian Medical College & Hospital in Vellore, South India, making reference to a letter from the Acting Medical Secretary of the Commission on Ecumenical Missions and Relations of the United Presbyterian Church in the United States of America. The latter had written the former quoting a portion of a letter petitioner had written to a "Dr. Odell" regarding his interest in giving lectures on pain control in dentistry. The suggestion was made that petitioner contact certain persons in Bombay and in Okayama, Japan, with respect to giving lectures on pain control in dentistry. Manila was the only one of the places on the world tour being arranged for petitioner and his family in which petitioner was able to make satisfactory arrangements to present his lecture. Under date of March 29, 1961, petitioner received an invitation from the President of the Philippine Dental Association to give a lecture in Manila. On May 12, 1961, he replied to this letter and in apologizing for his delay in answering, explained that he was "awaiting conformation of *89 our tour schedule." By the May 12, 1961 letter petitioner confirmed arrangements for lectures to be given on the evening of June 22, 1961, by himself, his wife, Mary, and his daughter, Wanda, his lecture to be on pain control in dentistry, Mary's on office management, and Wanda's on ways in which the dental assistant can reduce the workload of the dentist. The reason petitioner did not make arrangements to lecture in cities other than Manila was that he was unwilling to give a lecture in any city except on the scheduled date the Bali-Hi tour was to be in that particular city. Petitioner, Mary, and their two children took the planned tour commencing shortly before June 3, 1961, the date the Bali-Hi tour departed from Honolulu for Tokyo, and continuing through September 3, 1961, when they returned to St. Louis from the European portion of the tour. They generally followed the itinerary of the Bali-Hi tour and European tour as outlined by the tour schedule, except that for the two or three days the tour was in Manila petitioner did no sight-seeing but spent his time giving a lecture to the Philippine Dental Association and in discussions with dentists and a visit to the dental school *90 of a university. Under date of July 6, 1961, a newspaper article appeared in the St. Louis Globe Democrat, referring to petitioner's lecture in Manila. In approximately six to ten other cities included in the schedules of the Bali-Hi and the European tours, petitioner would for a short while, sometimes as much as a half day, depart from the scheduled tour or use free time allowed on the tour, to visit with local dentists or at the dental school of some university. Most of the dental schools he attempted to visit were closed for summer holidays and he was unable to meet the professors but would talk to some of the personnel such as the Registrar. When the tour was in Saigon petitioner went without prior arrangements, to the hospital ship U.S.S. Hope. He walked right past the guard down to the dental department and talked with the dentists working there and saw certain patients whose dental diseases he diagnosed. In several instances in the Oriental countries he saw persons with oral tropical diseases which sometimes are manifested in servicemen returning from the Far East. Petitioner on his trip took approximately 2,500 slides of which approximately 50 dealt with dental subjects. *91 He planned to, and later did, use these slides in lectures he gave dealing with his observations with respect to dentistry in the Far East. Except for the few days in Manila, petitioner spent the most of his time following the regular outlined Bali-Hi tour and private European tour. Petitioner's family followed very closely the planned itinerary of both of these tours. The Bali-Hi tour included much sight-seeing and entertainment in which petitioner and his family participated. In Tokyo, petitioner went with the tour for an evening by motorcoach to a Japanese tea house, for a fascinating "Geisha Party"; a morning sight-seeing tour of the city including the palace ground, the government buildings and temples, a visit to the unique Kabuki Drama, and dinner in the Ginza with a stroll through some of the interesting corners of the area. During the rest of the stay in Japan petitioner went with the tour to Nikko, Chuzenji, and Kegon where he took a motor excursion to a lake and waterfall and to Kamakura and Fujiya where the tour stayed in the world famous Fujiya Hotel in the mountains. He went with the tour to Lake Hakone, for a view of Mt. Fuji, the honeymoon village of Atami and to *92 Nagoya where he participated in an afternoon tour of the city including the famed castles and its dolphins. Petitioner continued with the Bali-Hi tour to approximately four other places in Japan where he participated in the sight-seeing activities arranged by the tour. Leaving Japan on June 12, 1961, petitioner and his family proceeded to Formosa, Sun-Moon Lake, Hong Kong, again taking the various sight-seeing trips provided including boat trips on Sun-Moon Lake and Green Lake, a Chinese opera, and a welcome dinner in the grand Chinese manner. In Hong Kong the tour visited the Tiger Balm Garden on top of Mt. Victoria and had dinner at the famous floating restaurant. The tour spent 3 1/2 days in Hong Kong with sight-seeing arranged for the majority of the time and petitioner participated in most of the sight-seeing provided. The tour was scheduled to depart for Manila on June 20, but was delayed because of some difficulty with the plane in which it was traveling so that the tour arrived a day late in Manila. Petitioner's family did some sight-seeing in Manila but on the evening of June 22, when petitioner, Mary and Wanda each gave a lecture before the various dental societies of the *93 Philippines which had gathered especially to hear their talks, none of them did any sight-seeing. Petitioner's son operated the slide projector for petitioner during petitioner's lecture. After leaving Manila, petitioner continued with the tour to Saigon and from there to Angkor where the tour was scheduled for a tour of the celebrated ruins of Angkor Wat and Angkor Thom in which petitioner and his family participated. Petitioner and his family then proceeded with the tour to Bankok where they visited the Royal Palace, the Emerald Buddha, and the Golden Cheddi and saw the Thai dances. They also took a boat trip around the "klongs" to see the floating markets, the Temple of Dawn and the royal barges. Petitioner and his family continued on with the tour to Djakarta and to Bali. In Bali they took a motor tour of the Holy Forest of Sangeh and saw the classical Legong Dances. They took an extensive tour of the island including the wood carving, silver work, and the temples. They attended a cockfight and the Ketchak Dances. They visited the Barong Dances, attended a "Bali-Night" party on the beach and dined in Bali fashion. From Bali they proceeded to Singapore where they took a tour *94 of the city including the Tiger Balm Garden; to Rangoon where they took a motor tour of the city including the famous "Golden Pagoda"; and to Calcutta where they visited several temples and the Botanical Gardens. They proceeded to Mt. Everest. Here they took an early morning drive to Tiger Hill to see the sun rise and visited the Ghoom Monastery. In Calcutta they took a tour of the city. From Calcutta they visited Benares and Sarnath, where they visited a yogi and saw a snake charmer perform. They proceeded to Agra and to Delhi where they took a number of arranged sight-seeing trips including many temples and shrines. They made an evening visit, as well as a daylight visit, to the celebrated Taj Mahal. From Delhi they went to Bombay to the Elephanta Caves, took other sight-seeing trips, and then proceeded to Cairo. From the tour of Cairo where they visited the temple of Luxor and crossed the Nile to visit the great Valley of Kings, the tomb of Queen Hatshepsut, and the Colossi of Memmon, they proceeded to Damascus, where they took an afternoon motor tour including visits to famous tombs and the famous "Street Called Straight." From there they proceeded to Beirut where they took *95 a motor survey of the city and surrounding country and then proceeded to Jerusalem. In Jerusalem petitioner and his family visited the Old City to see the various landmarks of the Holy Land; they motored to Bethany to see the Tomb of Lazarus and to Bethlehem to see the River Jordan and the Dead Sea. From there petitioner and his family proceeded with the tour to Tel Aviv where they took a short tour of New Jerusalem and proceeded on to Nazareth and Tiberius. Petitioners then proceeded with the tour to Istanbul where they took a boat trip on the Bosporus and morning motor tour of the city. They then proceeded to Athens from which they took a morning drive to Daphni and continued in the afternoon to Delphi with sight-seeing trips to its famous Sacred Way, Wall of Inscriptions, Treasury of Athenians, and Temple of Apollo. They returned with the tour to Athens, took a morning trip by steamer to Mykonos, returning by steamer to Athens where the Bali-Hi tour ended. There were approximately 20 people including petitioner and his family on the Bali-Hi World Tour. The itinerary of the European trip which was followed by petitioner and his family included a visit to Rome, where petitioners' *96 son and daughter left petitioners for a trip through Spain. Petitioners traveled to Naples, Florence, Venice, Milan, Lucerne, Weisbaden, Cologne, Dusseldorf, and Copenhagen. At Copenhagen petitioners' son and daughter rejoined petitioners and the entire family went to Moscow, Helsinki, and Stockholm. Petitioners' daughter alone took a trip in the Scandanavian countries, joining her mother, father, and brother in London on August 29, 1961. From London, petitioner, his wife, and two children took a trip to Edinburgh, Glasgow, and Dublin. At most of the places included in the European tour there was prearranged sight-seeing for petitioner and his family by private car with English-speaking guides. At Naples, there was a prearranged full-day excursion of Pompeii, Amalfi, and Sorrento; at Venice, a sight-seeing trip by private gondola with English-speaking guide; at Lucerne and Baden Baden, a motor tour; at Copenhagen, Moscow and Helsinki, there was prearranged sight-seeing by private car and with English-speaking guides, and likewise at Stockholm, Amsterdam, and Paris. At Edinburgh again petitioner and his family had prearranged sight-seeing. Petitioner participated in most of the sight-seeing *97 arranged on the individual European tour just as he had on the Bali-Hi World Tour. There were costs of the trip for petitioner and his family in addition to the $17,895.87, which petitioner paid to Foster. The total cost of the trip for all of the family was approximately $24,000. Of this amount approximately $600 was spent for film on which to take slides. The only expenses which petitioner had in connection with his visits to the dentists and universities which he visited were cab fares and occasionally purchasing a lunch for one of the dentists he visited. In Manila petitioner incurred expenses for lodging and meals. The Dental Association provided him with transportation to and from the lecture and to visit various dentists and the dental school of the university. Since petitioner's return from his world tour, he has given several lectures in which he showed the dental slides which he took on the trip and has also given lectures before church groups, service clubs, and other nonprofessional groups in which he showed the slides he took of the various places of sight-seeing interest including a slide of the Taj Mahal. Mary has occasionally given lectures showing some of the slides *98 which petitioner took while the family was on the world tour, and petitioner's son has shown the slides to groups of which he was a member on occasions. Approximately 80 percent of the patients of petitioner's dental clinic are from the St. Louis area. Of the other 20 percent, about 5 percent live within a radius of 50 to 200 miles of St. Louis. Of the 5 percent that live farther than 200 miles from St. Louis, about one-fifth or 1 percent of petitioner's total patients live farther than 500 miles from St. Louis. In the lecture on pain control in dentistry which petitioner gave in Manila, he used material from various courses he had taken prior to the year 1961 as well as observations he had made in his own practice. There is much literature available in the medical and dental libraries in this country and in the libraries of the two dental universities in St. Louis with respect to the psychological problems connected with dentistry. The economy class plane fare for four persons from San Francisco to Manila would be approximately the same as the plane fare from San Francisco to Manila by way of Tokyo. During the years 1961 and 1962 petitioner, in addition to a family car and *99 a car which he kept for the use of his son and his daughter's car, personally owned another automobile which was either a Hillman Husky or a Corvair. It was used to make calls at the hospital when he had patients in the hospital on whom he had performed surgery and was also used when it was necessary for him to make a home call on a patient because of a hemorrhage occurring after the patient had left the hospital. Generally, petitioner made these calls personally, using this car, but if he were out of the city the car would be used for similar calls by one of the dentists employed by petitioner in his clinic. The car was kept in petitioner's garage at home and petitioner generally drove to his office and back home from his office in this car. He drove in this car to dental meetings and occasionally to a church meeting. Petitioner generally spent Wednesdays in the hospital and on that day would generally drive to the hospital in the morning and return home after leaving the hospital. Sometimes it would be necessary for him to return to the hospital in the evening and sometimes he would have to go by the hospital the day before surgery was to be performed in which event he would drive *100 from his home or office to the hospital in the evening or day prior to performing surgery. Mary generally worked 6 days a week in petitioner's clinic as office manager. She wore a clean uniform to the office each day. Other employees in the office also wore uniforms and most of these uniforms were sent to the laundry and the laundry bill was paid by petitioner. Since Mary preferred to put on her uniform before she left her home in the morning, she had her uniform laundered at home. The work was done by a woman employed by Mary as a laundress and by petitioner as a cleaning woman for the offices of his dental clinic. In addition to laundering Mary's uniforms, this woman also did some family laundry for petitioner and his family, but did no other work in his home, the other work being done by a maid who was employed by Mary for other work in the home. Petitioner in computing his income from his business or profession (Schedule C of petitioners' income tax return) for the year 1961 claimed a deduction in the amount of $5,527.32 under the designation, "Dental Instruction and Lectures Tour - 'Pain Control in Dentistry'." Included in this amount was an item of "Airline fare for four *101 persons, economy class, St. Louis to San Francisco to Tokyo to Manila (round trip) $4,355.36" and another item of "Hotels, meals and taxi fares at Manila $183.00." Petitioner in computing the income from his business or profession deducted an amount of $200 which represented a payment by him to Mary for the cost and maintenance of uniforms. This $200 was not included by petitioners as income on their income tax return. Petitioner claimed a deduction in the year 1961, in computing his income from business or profession, of $1,200 for auto expense and for the year 1962 claimed a similar deduction in the amount of $1,095.49. Respondent in his notice of deficiency disallowed $4,538.36 of the deduction claimed by petitioner under the designation, "Dental Instruction and Lectures Tour - 'Pain Control in Dentistry'." Respondent's explanation for this disallowance was that petitioner had not established that the amount of $4,538.36, which represented a portion of the cost of a trip around the world constituted an ordinary and necessary business expense. For the year 1961 respondent increased the income reported by petitioners by the amount of $200 with the explanation that it was determined *102 that petitioners realized income for the cost and maintenance of uniforms in this amount which had not been reported on their income tax return. For the year 1961 respondent increased petitioners' income by the amount of $240 with the explanation that petitioner had not established that an amount in excess of $960 for automobile expense constituted an ordinary and necessary business expense or was expended for the purpose designated. For the year 1962 respondent disallowed $219.10 of the automobile expense deduction claimed by petitioner with the explanation that petitioner had not established that an amount of deduction claimed for this item in excess of $876.39 constituted an ordinary and necessary business expense or was expended for the purpose designated. Ultimate Findings The primary purpose of the trip taken by petitioner and his family in 1961 was for their personal pleasure and enjoyment. Mary and petitioner's son and daughter engaged in no activities on the trip which gave rise to ordinary and necessary business expenses of petitioner. The lecture given by petitioner in Manila was beneficial to petitioner in his profession of dentistry in that it offered him the opportunity *103 to further bring his emphasis on pain control in his practice to the attention of the other dentists in St. Louis, Missouri and other parts of the United States. The visits made by petitioner to dentists while on his world tour were beneficial to petitioner in his profession of the practice of dentistry in that he obtained information or slide pictures which could be used in professional lectures which he gave upon his return. Petitioner's lecture in Manila and his visits to dentists and universities there and in other cities and his taking of slide pictures of dental subjects were business activities engaged in by petitioner at destinations to which he had traveled primarily for personal purposes. Petitioner has not shown that the costs of business use of the automobile which he used in his practice of dentistry exceeded $960 in the year 1961 and $876.39 in the year 1962. The amount of $200 paid to Mary by petitioner for cost and maintenance of uniforms is properly includable in Mary's income for the year 1961, and Mary is entitled to a deduction in 1961 in the amount of $200 for expenses of maintaining and laundering her uniforms. Opinion Although petitioners on their income *104 tax return claimed as a business expense only the portion of the total cost of their world tour which represented four round trip fares from St. Louis to Manila and some amount for hotels, meals, and taxi fares while at Manila, by amended pleadings they claimed that the entire cost of the trip, which they state to be $24,455.55, is deductible as a business expense. From the facts we have recited we conclude that the primary purpose of the world tour which petitioner and his family took in 1961 was pleasure and have so found. The only showing that petitioner even attempts to make of any business purpose of the trip for Mary and petitioner's daughter, Wanda, was the lecture in Manila. Petitioner claims a business purpose for his son in Manila as an operator of the slide projector during petitioner's lecture. The evidence, however, shows that petitioners planned their trip of a world tour for their pleasure and the pleasure of their children. Petitioners had been planning the trip for sometime before petitioner gave any consideration to any lecture which he, Mary, or Wanda would give on the trip. The evidence shows that the family, on the Oriental part of the trip, went on a regular *105 planned package type of tour open to the general public and that they participated in practically all of the activities of that tour, none of which was in any way connected with petitioner's profession of the practice of dentistry. Other than at Manila, petitioner showed no activity whatsoever on the part of Mary, his daughter, or his son in connection with his business of the practice of dentistry. Petitioner's testimony was to the effect that for his wife and children the trip was primarily a pleasure trip. The fact that petitioner would only give a lecture if it could be arranged when the tour was in a particular city where he could arrange to be invited to lecture and that petitioner spent most of his time on the trip sight-seeing and very little time visiting dentists and dental schools, demonstrates that the trip was primarily a pleasure trip for petitioner. If petitioner had really been planning a business trip, he would have arranged to be in a certain city at a time when he would be invited to lecture there and would have gone at a time when the dental schools were open so he could visit with the professors. The facts as a whole show that any business conducted by petitioner *106 on his trip was purely incidental to its main purpose of being a pleasure trip. The evidence does show that petitioner not only gave a lecture in Manila which served to add to his prestige as an expert in pain control in dentistry but that he also made some calls on dentists and took some professional slides during the course of the trip, thus obtaining some information and slides which were valuable in lectures which he gave. These lectures served to bring his work in pain control in dentistry to the attention of other dentists who might refer patients to him. The amount of time spent by petitioner in these activities was very nominal and any costs incurred in connection therewith were quite small. To be entitled to the claimed deduction for the expense of his world tour, petitioner would have to show, in accordance with the provisions of section 162(a)(2) of the Internal Revenue Code of 1954, [1] that the expenditure was for travel while away from home in the pursuit of a trade or business. Under the provisions of this section of the Code, where the primary purpose *107 of a trip is personal, the travel is of a personal nature and not in the pursuit of a taxpayer's trade or business. Section 1.162-2(b)(1) of the Income Tax Regulations[2] provides that if a trip is primarily personal in nature but the taxpayer, while at the destination, engages in both business and personal activities, the traveling expenses to and from the destination are not deductible, but expenses while at the destination which are properly applicable to the taxpayer's trade or business are deductible. *108 In the instant case the evidence shows that petitioner had some minor business expenses while in Manila. The lecture which he delivered while there was proximately related to his business. Likewise, the dental slides taken by petitioner on his trip and his visits to dentists and dental schools in various countries and his visit to the U.S.S. Hope were proximately related to his business of the practice of dentistry in that he acquired information and pictures useful in lecturing before professional organizations, thus helping to obtain patients by referrals from other dentists. The evidence is not sufficient to show the cost of these incidental business activities but is sufficient to show that the cost was quite small in relation to the sight-seeing and other personal aspects of the trip. Since respondent's regulations permit a deduction for expenses while at a destination to which petitioner has traveled primarily for personal reasons for amounts properly applicable to that taxpayer's trade or business, we consider it necessary to make some estimate of the small amount applicable to petitioner's activities in Manila and other countries which were of a business nature. See Richard A. Sutter, 21 T.C. 170 (1953); *109 Ralph E. Duncan, 30 T.C. 386 (1958); and Reuben B. Hoover, 35 T.C. 566, 570-571 (1961). We do not consider that the evidence shows that there was any business reason why petitioner's 16 or 17 year old son should run the slide projector for petitioner instead of some individual attending the lecture who might have performed this service. Petitioner has not shown that the lecture given by Mary or the one given by Wanda was sufficiently related to his business to cause any portion of their expenses to be deductible. See Ralph E. Duncan, supra.
Neither do we consider the nonprofessional lectures given by petitioner, Mary, and petitioner's son, where they showed their travel slides to various church, civic, and fraternal groups to be proximately related to petitioner's business. Petitioner's testimony showed his interest in the slides and pictures he took of the many places which were visited on the tour and the evidence as a whole leaves the inference that the showing of these travel slides by petitioner or members of his family was for their personal enjoyment and as a social activity and not proximately related to petitioner's business. *110 See Alexander P. Reed, 35 T.C. 199 (1960). Upon a consideration of all the evidence in this case, our best judgment is that petitioner on his world wide trip expended $250 in connection with business activities and therefore is entitled to a deduction in this amount. See Ralph E. Duncan, supra. We therefore sustain respondent in his disallowance of the deduction claimed by petitioner for expenses in connection with the world tour of petitioner and his family except to the extent of $250. Although most of petitioner's activities in Manila were connected with his business, his travel to Manila was not primarily of a business nature, but was because the trip which he took for his personal pleasure made a stop in Manila. Petitioner has not shown the amount expended with respect to the car he kept primarily for business use. He estimated that he drove the car approximately 12,000 miles a year, but he did not know whether this estimate was accurate. He did not know when he disposed of a Hillman Husky and got a Corvair, so that he was not sure whether he was driving a Hillman Husky or a Corvair during the years 1961 and 1962. Petitioner attempted to sustain *111 the amount of deduction he claimed by saying that it probably cost him 10 cents a mile to drive the cars and he probably drove about 12,000 miles. This evidence is totally insufficient to sustain the claimed deductions. Without knowing more about the type of car driven than shown in this record or of the costs connected therewith, we would be unwilling to accept petitioner's estimated cost even if we could rely on his estimate of the mileage driven. Furthermore, petitioner did use the car to drive to and from work and what percentage of the mileage driven consisted of this commuting cost which is not a deductible item is not shown. Respondent disallowed only 20 percent of the deduction claimed which left a substantial amount of the deduction allowed for business use of the car. Petitioner has failed to prove error in respondent's determination. The evidence shows that Mary wore uniforms at her work and wore a fresh one every day. The fair inference is that it was necessary for her to wear these uniforms. Everyone working in this clinic wore a uniform and the clinic paid for the laundering of all the uniforms worn by its employees. It is obvious that Mary's uniforms had to be laundered. *112 Respondent makes some argument that these uniforms replaced Mary's ordinary street clothes and therefore their upkeep was personal. We consider the evidence sufficient to show that the uniforms worn by Mary were worn by her because of a reasonable necessity of her employment in a dental office and were not a replacement for ordinary clothes. Respondent has allowed no deduction to petitioners for the upkeep of Mary's uniforms. We agree with respondent that the $200 which Mary received for uniform upkeep is income, but disagree with his failure to allow her a deduction for the expense of her upkeep of these uniforms. The evidence is sufficient to show that the approximate cost of the upkeep and laundering of Mary's uniforms in 1961 was the amount of $200 paid to Mary by petitioner for this purpose. We conclude that even though petitioners should have included the $200 in their income and deducted a similar amount as cost of laundering Mary's uniforms, respondent was in error by increasing their income by this amount without allowing an offsetting deduction. Decision will be entered under Rule 50. Footnotes
1. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - * * *
(2) traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business; and * * *↩
2. Sec. 1.162-2(b)(1)↩ (Income Tax Regs.) If a taxpayer travels to a destination and while at such destination engages in both business and personal activities, traveling expenses to and from such destination are deductible only if the trip is related primarily to the taxpayer's trade or business. If the trip is primarily personal in nature, the traveling expenses to and from the destination are not deductible even though the taxpayer engages in business activities while at such destination. However, expenses while at the destination which are properly allocable to the taxpayer's trade or business are deductible even though the traveling expenses to and from the destination are not deductible.